UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 10-10159-PBS |
| ) | |
| TODD LYONS ) | |
| DANIEL EREMIAN, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

May 4, 2012

Saris, U.S.D.J.

Pursuant to Fed. R. Crim. P. 29(c) and 33(a), defendants Todd Lyons and Daniel Eremian move for a judgment of acquittal, or in the alternative for a new trial. After hearing, the motions are **DENIED**. I address the major issues below.

### I. Factual Background

This case concerns a gambling enterprise, Sports Offshore, headquartered in Antigua and operating in Massachusetts, Florida, and other parts of the United States from approximately 1997 through 2010. It was owned by co-defendant (and fugitive) Robert Eremian, who is Daniel's brother. Sports Offshore allowed people in the United States to place bets on sporting events by making

1

telephone calls to Antigua or visiting an internet website. Losing bettors regularly made payments in cash to Sports Offshore agents located in the United States, and other payments were submitted via checks made out to shell corporations.

Lyons and Eremian were members of the Sports Offshore enterprise. Lyons was the primary collector for Sports Offshore in Massachusetts. He regularly met agents in Massachusetts to collect from them the money they had collected from their bettors, and he also served as an agent himself collecting directly from his own bettors. Daniel Eremian traveled to Antigua to help his brother set up the Sports Offshore operation and then returned to his home in Florida, where he served as an agent collecting money directly from losing bettors.

After a month-long trial, a jury convicted Defendants Lyons and Eremian of racketeering conspiracy, racketeering, operating an illegal gambling business, and violating the federal Wire Act. The jury also convicted Defendant Lyons of multiple counts of money laundering, interstate travel in aid of racketeering enterprises, making and subscribing false tax returns, and acceptance of financial instruments for unlawful internet gambling.

## II. Legal Standard

Under Rule 29, "[a] judgment of acquittal should only be granted when the evidence and all reasonable inferences to be drawn from the evidence, both taken in the light most favorable to the government, are insufficient for a rational factfinder to conclude that the prosecution has proven, beyond a reasonable doubt, each of the elements of the offense." United States v. Pimental, 380 F.3d 575, 583 (1st Cir. 2004) (citing United States v. Moran, 312 F.3d 480, 487 (1st Cir. 2002); United States v. Campbell, 268 F.3d 1, 6 (1st Cir. 2001)).

Fed. R. Crim. P. 33 provides: "Upon the defendant's motion, the Court may vacate any judgment and grant a new trial if the interest of justice so requires." The First Circuit has cautioned that "[t]he remedy of a new trial is sparingly used, and then only where there would be a miscarriage of justice." United States v. Indelicato, 611 F.2d 376, 387 (1st Cir. 1979) (quoting United States v. Leach, 427 F.2d 1107, 1111 (1st Cir. 1970)) (internal quotation marks omitted). See United States v. Rivera Rangel, 396 F.3d 476, 486 (1st Cir. 2005) (stating that a new trial should not be granted "because [the trial court] would have reached a different result"); see also United States v. Glantz, 810 F.2d 316, 321 (1st Cir. 1987) (new trial not appropriate to correct minor flaws in a trial process that

"although imperfect ... adequately protected [the] defendant's rights").

### III. Jury Instructions Regarding Florida Law

Defendant Eremian argues this Court erred in instructing the jury on Florida state law because the indictment did not explicitly reference Florida law. In his view, the instructions on Florida law were clearly erroneous and constituted an impermissible constructive amendment to the indictment.

This Court instructed the jury that it should consider Florida law when deciding whether Mr. Eremian committed racketeering act five (money laundering) and whether he collected an unlawful debt. See Tr. 16-217 to 16-218, 16-222, 16-258.[1]

---

[1] This court instructed the jury as follows regarding racketeering act five, money laundering: "Note, as I will explain later, you should consider Florida law when considering whether Daniel Eremian committed racketeering act 5, money laundering. And I'll be talking about Florida, different state laws later on." Tr. 16-217 to 16-218. This court instructed the jury as follows regarding collection of an unlawful debt:

> What's an unlawful debt? An unlawful debt is a debt incurred or contracted in gambling activity which was in violation of the laws of the United States or a state or political subdivision thereof. Here the laws at issue are the federal laws that I'm about to instruct you on, and that's what we've been calling the use of wire communication facilities, and then there's -- I'm just trying to get to the exact name of it -- the illegal gambling business laws which I'll be instructing you about, as well as the laws of the states of Massachusetts, Florida, and South Carolina. So I'll be telling you in greater depth what those laws provide.

Tr. 16-222. Finally, this court instructed the jury as follows regarding Florida gambling law:

4

Because both crimes implicate 18 U.S.C. § 1955, which requires a consideration of relevant state law, and the indictment alleged these offenses occurred in Florida, it was appropriate to instruct the jury on Florida law.

In racketeering act five, the indictment charged Mr. Eremian with money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i).  <u>See</u> Doc. No. 189 at 13-14.  This statute criminalizes conducting a financial transaction that "involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership,

---

> Now, let me talk to you for a minute about Florida and South Carolina law because when I talked about the collection of an unlawful debt as it relates to Count Two, and also Count Five of the predicate acts, with respect to Mr. Eremian, it involves Florida law. So let me instruct you about Florida law and South Carolina law.  It is a violation of Florida law to engage in the business or profession of gambling and take or receive any bet or wager upon the result of any trial or contest of skill, speed, power or endurance of human, beast, fowl or motor vehicle or mechanical apparatus or upon the result of any chance, casualty, unknown or contingent event whatsoever.  It is also a violation of Florida law to stake, bet or wager any money or other thing of value upon the result of any trial or contest of skill, speed, power or endurance of human or beast; or to receive in any manner whatsoever any money or other thing of value staked, bet or wagered, by or for any other person upon such result; or to become the custodian or depository of any money or other thing of value so staked, bet or wagered upon any such result; or to aid, assist or abet in any manner in any such acts.

Tr. 16-258.

or control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1). The specified unlawful activity alleged in the indictment included illegal gambling in violation of 18 U.S.C. § 1955.[2] See Doc. No. 189 at 13. Therefore, to decide whether Mr. Eremian was guilty of racketeering act five, the jury had to determine whether the financial transactions Mr. Eremian was alleged to have conducted involved proceeds resulting from violations of 18 U.S.C. § 1955.

To allow the jury to make that determination, the court instructed the jury on relevant Florida gambling law. This is because (1) 18 U.S.C. § 1955 prohibits conducting an "illegal gambling business;" (2) an "illegal gambling business" is defined to mean one which "is a violation of the law of a State or political subdivision in which it is conducted," 18 U.S.C. § 1955(b)(1)(i); and (3) the indictment alleged Mr. Eremian conducted an illegal gambling business, Sports Offshore, in Florida. See Doc. No. 189 at 3. Because the jury had to determine whether Sports Offshore was a gambling business that violated Florida law, it was necessary to instruct the jury on the relevant Florida gambling law. He was acquitted of racketeering act number five.

---

[2] "Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 1955(a).

This Court similarly instructed the jury that it should consider Florida law when deciding whether Mr. Eremian collected an unlawful debt. See Tr. 16-222, 16-258. He was convicted on this charge. Under the Racketeer Influenced and Corrupt Organizations Act, the government must prove either a "pattern of racketeering activity" or "collection of an unlawful debt." 18 U.S.C. § 1962(a). To determine whether the debts Mr. Eremian allegedly collected were unlawful under 18 U.S.C. § 1961(6), the jury had to decide whether the debt was "incurred or contracted in gambling activity which was in violation of the law of the United States . . . ." 18 U.S.C. § 1961(6). The Court explained to the jury that the relevant law of the United States charged in the indictment included 18 U.S.C. § 1955, which prohibits illegal gambling businesses and requires a consideration of state law, as explained above. See Tr. 16-222. See Doc. No. 189 at ¶ 1. Here, the indictment alleged Mr. Eremian collected bets in Florida, and it charged him with collecting bets from a number of specific bettors whose uncontroverted trial testimony was that Mr. Eremian was a collector in Florida. See Doc. No. 189 at 3, 17-20. Thus, it was again necessary to instruct the jury on relevant Florida gambling law. Because the indictment itself charged violations of 18 U.S.C. § 1955 that occurred in Florida, such instructions did not constructively amend the terms of the indictment. Cf.

7

United States v. Rodriguez-Rodriguez, 663 F.3d 53, 58 (1st Cir. 2011) ("A constructive amendment occurs when the charging terms of an indictment are effectively altered by the prosecution or court after the grand jury has last passed upon them.").

### IV. The Safe Harbor Provision of 18 U.S.C. § 1084(b)

Defendants Lyons and Eremian were convicted of violating 18 U.S.C. § 1084 ("the Wire Act"), which prohibits the use of a wire communication facility for transmitting in interstate or foreign commerce wagers on sporting events or information assisting in the placing of such wagers. The statute carves out an exception for certain types of transmissions:

> Nothing in this section shall be construed to prevent the transmission in interstate or foreign commerce of information for use in news reporting of sporting events or contests, or for the transmission of information assisting in the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or contest is legal into a State or foreign country in which such betting is legal.

18 U.S.C. § 1084(b). The statute "provides a safe harbor for transmissions that occur under both of the following two conditions: (1) betting is legal in both the place of origin and the destination of the transmission; and (2) the transmission is limited to mere information that assists in the placing of bets, as opposed to including the bets themselves." United States v. Cohen, 260 F.3d 68, 73 (2d Cir. 2001).

Defendants Lyons and Eremian argue this safe harbor provision protected their conduct because the betting alleged was, according to them, legal in both Massachusetts and Antigua. The defendants further maintain that this Court erred by not instructing the jury on the safe harbor provision and not providing the jury with relevant Massachusetts and Antigua law to allow the jury to decide whether that provision protected their conduct.

The threshold question is whether the safe harbor provision of 18 U.S.C. § 1084(b) is an element of the offense or an affirmative defense. A defendant is entitled to an instruction on an element of the offense but not necessarily to an instruction on an affirmative defense. See United States v. Kloess, 251 F.3d 941, 945-46 (11th Cir. 2001). While none of the parties focused on this question in the briefing, Lyons referred to the safe harbor provision as an affirmative defense. See Lyons' Renewed Mot. for J. of Acquittal or for a New Trial at 16, Doc. No. 204 ("In the instant case, the Court removed the Defendants' ability to argue the affirmative defense by deciding the issue instead of giving it to the jury."). Moreover, as the Eleventh Circuit Court of Appeals has explained, "Congress . . . routinely creates exceptions to criminal liability[, such as in the form of safe harbor provisions,] for various offenses. Most of these exceptions do not contain language indicating that they are affirmative defenses rather than elements of the offenses.

9

Nevertheless, the courts generally interpret them as affirmative defenses."[3] Kloess, 251 F.3d at 945; see, e.g., id. at 945 (collecting cases).[4] Because Congress created an exception to criminal liability under the Wire Act in 18 U.S.C. § 1084(b), this safe harbor provision constitutes an affirmative defense. Cf. United States v. Mintmire, 507 F.3d 1273, 1293 (11th Cir. 2007) (explaining that the safe harbor provision of 18 U.S.C. § 1515(c) "is an affirmative defense, not an element of the crimes of which Mintmire was convicted.").[5] And because the safe harbor provision is an affirmative defense, Defendants Lyons and Eremian were entitled to have the jury instructed about this provision only if there was sufficient evidence in the record for a reasonable jury to find that it protected their conduct. See Cohen, 260 F.3d at 74 (upholding the district court's decision

---

[3] Moreover, the "Supreme Court has [similarly] made clear that 'an indictment ... founded on a general provision defining the elements of an offense ... need not negative the matter of an exception made by a proviso or other distinct clause, whether in the same section or elsewhere....' McKelvey v. United States, 260 U.S. 353, 357 . . . (1922)." Kloess, 251 F.3d at 945.

[4] Various unpublished opinions have held that safe harbor exceptions are affirmative defenses. See, e.g., United States v. Job, 387 Fed. Appx. 445, 456 (5th Cir. 2010) (presenting a safe harbor exception as an example of an affirmative defense); United States v. Norton, 17 Fed. Appx. 98, 101 (4th Cir. 2001) (treating a safe harbor provision as an affirmative defense).

[5] Cf. Modern Continental v. Occupational Safety, 305 F.3d 43, 51 (1st Cir. 2002) (describing "an affirmative defense of unpreventable employee misconduct" in the context of the Occupational Safety and Health Act as providing a "safe harbor").

not to instruct the jury on the safe harbor provision of 18 U.S.C. § 1084(b) because it did not apply as a matter of law due to the illegality of betting in New York and evidence of bets placed in New York); see also Mathews v. United States, 485 U.S. 58, 63 (1988) ("As a general proposition a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor."); United States v. Job, 387 Fed. Appx. 445, 456 (5th Cir. 2010) ("A sufficient foundation for an affirmative defense (such as the safe-harbor exception) consists of 'evidence sufficient for a reasonable jury to find in [the defendant's] favor'."); United States v. Lopez-Lopez, 282 F.3d 1, 18 (1st Cir. 2002) ("The defendant is not entitled to an instruction on a defense when the evidence in the record does not support that defense."); United States v. Eshkol, 108 F.3d 1025, 1029 (9th Cir. 1997) (upholding the district court's refusal to give the defendant's proposed jury instruction regarding the safe harbor provision of 18 U.S.C. § 504 because the defendant did not provide sufficient evidence that it protected his conduct). Furthermore, "[a] mere scintilla of evidence" would not be sufficient to warrant an instruction on the safe harbor provision. See United States v. Burt, 410 F.3d 1100, 1103 (9th Cir. 2005) (explaining that a "mere scintilla of evidence supporting a defendant's [public

authority defense] theory, however, is not sufficient to warrant a defense instruction.").

In this case, defendants challenge the Court's decision that there was not sufficient evidence in the record for a reasonable jury to find that the safe harbor provision of 18 U.S.C. § 1084(b) protected the defendants' conduct.

Under the Wire Act, there is an important distinction between the transmission of information assisting in the placing of bets and the transmission of actual bets themselves. The Act prohibits one engaged in the business of betting or wagering from knowingly using "a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest . . . ." 18 U.S.C. § 1084(a). The Act's safe harbor provision, 18 U.S.C. § 1084(b), carves out an exception that covers the transmission of information assisting in the placing of bets but not the transmission of actual bets themselves. See Cohen, 260 F.3d at 73; United States v. McDonough, 835 F.2d 1103, 1104 (5th Cir. 1988). Consequently, the safe harbor provision does not apply if the defendants transmitted actual bets or wagers and not merely information assisting in the placing of bets or wagers.

Because Eremian used wire communication facilities to transmit in interstate or foreign commerce actual bets or wagers, the safe harbor provision was not applicable to him. At trial,

12

there was uncontroverted testimony that Mr. Eremian not only set up bettors to use the Sports Offshore website and provided them with betting codes but also directly placed bets for his bettors using the internet.  See Tr. at 11-225 to 11-228 (indicating that Eremian placed bets for John Ferolito, the owner of Arizona Iced Tea).  Because Mr. Eremian himself placed actual bets or wagers, and not merely information assisting in the placing of bets or wagers, the safe harbor provision was not applicable to him with respect to the wire act-internet charge.

Although there was no evidence that Lyons himself directly placed bets, the government appears to suggest that because Lyons caused bettors to transmit actual bets or wagers, the safe harbor provision did not apply to him.[6]  There was uncontroverted trial testimony that Lyons and Eremian provided to bettors account numbers and pass codes as well as telephone numbers to call, and an internet website to visit, to allow them to place bets.  See Tr. at 7-110, 12-8.  In a similar situation, one court has held that the provision of such information caused the use (by the bettors) of a wire communication facility to transmit in interstate or foreign commerce bets or wagers in violation of the Wire Act and 18 U.S.C. § 2(b), which creates criminal liability

---

[6] The Court instructed the jury, without objection by any party, to consider whether the defendants "used *or caused to be used* a wire communication facility to transmit in interstate or foreign commerce bets or wagers or information which assisted in the placing of bets or wagers on any sporting event or contest." Tr. 16-236 (emphasis added).

13

for one who "willfully causes an act to be done which if directly performed by him or another would be an offense against the United States." 18 U.S.C. § 2(b); see United States v. Kelley, 395 F.2d 727, 729 (2d Cir. 1968), *cert denied*, 393 U.S. 963 (1968) (concluding that a defendant who told bettors how to place bets by making interstate telephone calls had caused Wire Act violations and upholding the Wire Act convictions).

To the extent that Lyons or Eremian used the telephone or internet to provide to bettors information assisting in the placing of bets, their conduct could have been protected by the Wire Act's safe harbor provision, which explicitly allows "the transmission [via wire communication facility] of information assisting in the placing of bets or wagers" under certain circumstances. Id.

Yet even assuming the defendants used wire communication facilities for transmitting information assisting in the placing of bets, which unlike the transmission of bets themselves can be protected by the safe harbor provision, the safe harbor provision did not apply as a matter of law because there was evidence that bets were transmitted to Antigua, and from Florida, and the betting conducted was not legal in either location. Under the safe harbor provision, the transmission of information assisting in the placing of bets is only protected if it involves "the placing of bets or wagers on a sporting event or contest from a State or foreign country where betting on that sporting event or

contest is legal into a State or foreign country in which such betting is legal." 18 U.S.C. § 1084(b). Thus, the betting must be legal in both the locations from which and into which the information is transmitted. In this case, the evidence at trial indicated that much information assisting in the placing of bets on sporting events was transmitted from within the state of Florida. See, e.g., Tr. at 11-225 to 11-226. Florida law, however, criminalizes placing bets on sporting events. See Fla. Stat. § 849.14 (2012).[7] Thus, the safe harbor provision does not provide protection for the transmission from Florida of information assisting in the placing of bets or wagers.

The government argues the safe harbor provision does not apply because bets were placed from Massachusetts in violation of Massachusetts law. While Massachusetts law prohibits using a telephone to place wagers upon an athletic game or contest or the result of a trial or contest of skill, the government has not cited any Massachusetts law prohibiting the use of a computer and the internet for placing a bet at the time of the events in question. See Mass. Gen. Laws ch. 271, § 17A (2012) (prohibiting use of a telephone for gaming purposes). In this case, the government charged one count of violating the Wire Act through the use of a telephone, and one count of violating the Wire Act through the use of the internet. See Doc. No. 189 at 23-24.

---

[7] Defendant now criticizes the substance of the Florida instruction but this objection was not preserved at trial.

Thus, while the safe harbor provision might potentially be able to protect the transmission of information assisting in the placing of bets or wagers from Massachusetts if done via the internet,[8] it cannot apply to the transmission of such information via telephone.

Moreover, the information sent from Florida, Massachusetts, and other states was transmitted to Antigua, where the Sports Offshore gambling operation was based. According to the undisputed trial testimony of defense expert Mark Mendell, who authored the Antiguan gaming regulations, Sports Offshore operated in violation of Antiguan civil regulations by permitting bettors to bet on credit. See Tr. at 15-229 to 15-230. The Antiguan gaming regulations prohibited provision of credit to bettors; bettors instead were required to post-up in advance the money they wished to wager. Sports Offshore violated these regulations by permitting betters to bet on credit. Even if the method of taking bets in Antigua was not criminal, but rather merely a violation of civil law, it was nonetheless not "legal" as that term is used in 18 U.S.C. § 1084(b). See Cohen, 260 F.3d at 73-74 (concluding that betting that is not criminal is nonetheless illegal under 18 U.S.C. § 1084(b) if it is not permitted by law). Consequently, as a matter of law the safe harbor provision did not apply, and the Court properly refused to

---

[8] More recent legislation has criminalized internet gambling.

instruct the jury on it.  See id. at 73-74 (upholding the district court's decision not to instruct the jury on the safe harbor provision of 18 U.S.C. § 1084(b) after concluding it did not apply as a matter of law due to the illegality of betting in New York and evidence of bets placed in New York).

## V. The Separate Wire Act Counts

The defendants argue now for the first time that the government improperly charged two separate counts under the Wire Act, one pertaining to the use of a telephone and the other pertaining to the use of the internet.  They claim that only one count under the Wire Act was permissible because the use of the telephone or internet constitutes the same violation of the Wire Act.  As the government argues, however, there was evidence at trial of many separate, independent violations of the Wire Act using both the telephone (many bets were placed by calling a toll-free number) and the internet (many bets were placed on the Sports Offshore website) and each bet could have been charged separately.  The government explains that rather than charging many separate Wire Act violations, it charged one count of violating the Wire Act via internet and one count via telephone.  Defendants' argument that the internet and telephone are the same because both facilitate communication over a wire is as unpersuasive as claiming that a car and a horse-and-buggy are the same because both facilitate travel on a road.  Thus, the two separate Wire Act counts, one for violation via telephone and one

for violation via internet, are not duplicative and charging in that manner was not improper.

The Court rejects the other arguments advanced in their memoranda of law as without merit.

**ORDER**

Defendants' motions for judgment of acquittal and new trial (Doc. No. 202, 203, and 204) are **DENIED.**

/s/ PATTI B. SARIS
PATTI B. SARIS
United States District Judge